# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORI LYNN KENDALL, | Case No. 1:17-cv-00642-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | (Doc. 1) |

_____/

On May 6, 2017, Plaintiff Lori Lynn Kendall ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title XVI of the Social Security Act (the "Act"). (Doc. 1.) Plaintiff filed her opening brief on February 1, 2018, (Doc. 16), Defendant filed her opposition on March 27, 2018, (Doc. 19), and Plaintiff filed her reply on April 11, 2018, (Doc. 20). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 6, 9.)

# I.    BACKGROUND

On May 22, 2013, Plaintiff filed protectively an application for DIB payments, alleging that she became disabled on March 18, 2013, due to "chronic fatigue syndrome/fibromyalgia." (Administrative Record ("AR") 20, 26, 74, 197, 209.)  Plaintiff was born on May 30, 1973, and was 49 years old on the alleged onset date.  (AR 26, 74, 89, 197.)  She has a high school education.  (AR 26, 364.)  Plaintiff has past work experience as a medical receptionist and an x-ray operator.  (AR 30–31, 184, 200, 210.)

## A.    Relevant Medical Evidence[2]

### 1.    Treating Physician Rex A. Adams, M.D.

On March 15, 2013, Plaintiff presented to rheumatologist Dr. Adams for a self-referred rheumatology examination.  (AR 310–12.)  Plaintiff reported her symptoms of fatigue and poor mental focus had been worsening over the last 18 months.  (AR 310.)  She complained of cold symptoms, headache, sore throat, cervical lymphadenopathy, and increasing joint and muscle pain in her neck, shoulders, low back, and legs.  (AR 310.)

Dr. Adams' evaluation of Plaintiff noted "notable myofascial tender points involving the axial skeleton," specifically involving "areas of the occiput, posterior cervical, trapezius and rhomboid areas in a bilateral distribution."  (AR 311.)  Plaintiff also had "tenderness involving the low lumbar areas, medial aspect of the elbows and the posterior aspect of the legs over the calf areas."  (AR 311–12.)  Dr. Adams assessed Plaintiff with a "[l]ongstanding chronic fatigue syndrome/fibromyalgia syndrome apparently in exacerbation over the past 18 months with associated sleep disturbance."  (AR 312.)  Dr. Adams recommended that Plaintiff take Adderall and continue with Trazodone, and suggested "medical disability" over a period of two months from March 18 to May 19, 2013.  (AR 312.)

Plaintiff presented for a follow up appointment with Dr. Adams on May 7, 2013.  (AR 302–03.)  She reported that although her mental focus was "somewhat better" early in the

---

[2] Plaintiff's assertions of error are limited to the following: (1) the ALJ's finding that Plaintiff's mental impairments associated with her fibromyalgia and chronic fatigue syndrome were not severe; (2) the ALJ's RFC assessment, particularly the alleged failure to consider mental limitations and the finding that Plaintiff could perform light work; and (3) the ALJ's consideration of Plaintiff's subjective complaints.  Only evidence relevant to those arguments is set forth below.

morning with Adderall, she "did not feel well through the day" and "had a racing sensation and anxiety that precluded further use after the first week." (AR 303.) Plaintiff continued to feel "drugged," "dizzy and nauseated," and "quite fatigued[,] despite attempts at resting as much as possible." (AR 303.) She reported that she was required to go to Los Angeles for a three-day period in order to maintain her licensure for densitometry, and had a "severely bad time with motion sickness, anxiety, sweaty and clammy sensation, and diffuse muscle pain" from which it took her "several days to recover." (AR 303.) Plaintiff stated that although her fatigue and nausea is "somewhat better," she "continues to have trouble with mental focus and anxiety." (AR 303.)

On examination of Plaintiff, Dr. Adams observed "myofascial tender points involving areas of the occiput, posterior cervical, trapezius and rhomboid areas in a bilateral distribution," as well as "involving the medial aspect of the elbows and the lateral aspect of the thighs." (AR 303.) Dr. Adams assessed Plaintiff with "[l]ongstanding history of chronic fatigue syndrome/fibromyalgia syndrome with continued exacerbation despite recent disability and trial of Adderall therapy." (AR 303.) Plaintiff was prescribed Paxil and her disability extended through July 21, 2013. (AR 302.)

Plaintiff also completed a "Multi-Dimensional Health Assessment Questionnaire" on May 7, 2013. (AR 304.) In it, Plaintiff reported that she had no difficulty dressing herself (including tying shoelaces and doing buttons), lifting a full cup or glass to her mouth, walking outdoors on flat ground, washing and drying her entire body, turning faucets on and off, and getting in and out of a car, bus, train, or airplane. (AR 304.) She indicated having some difficulty getting in and out of bed, bending down to pick up clothing from the floor, and walking two miles. (AR 304.) Plaintiff reported being unable to participate in sports and games. (AR 304.) She further indicated she was unable to get a good night's sleep, and to deal with feelings of anxiety or being nervous, depression, or feeling blue. (AR 304.) Plaintiff reported her pain level was low and that fatigue was a "major problem." (AR 304.)

On June 21, 2013, Plaintiff called Dr. Adams' office to report that she has been unable to sleep for a week and was "depressed, anxious, losing a lot of hair, and feels like she is going to

have a nervous breakdown." (AR 301.) She requested that Dr. Adams prescribe an antifungal medication, but he refused, indicating he was "not comfortable giving a long term antifungal without constant monitoring," and recommended Plaintiff see her primary care physician for such treatment. (AR 301.)

At a follow up visit with Dr. Adams on July 9, 2013, Plaintiff complained of "severe fatigue" that varied in intensity but was present on a "regular basis," along with headaches and "significant nausea and dizziness." (AR 292.) Plaintiff reported that "[t]here is no day where [she] actually feels normal, feeling very anxious at times as well." (AR 292.) Dr. Adams' physical examination revealed the same "myofascial tender points" as previously noted, and he assessed Plaintiff with "[l]ongstanding history of chronic fatigue syndrome/fibromyalgia syndrome with persistent disability based on chronic fatigue, lack of mental focus, chronic nausea and inability to focus." (AR 292.) Dr. Adams extended her disability for an additional six months while awaiting results of a pending endocrine evaluation for "possible therapeutic opportunities." (AR 292.)

Plaintiff also completed another "Multi-Dimensional Assessment Questionnaire" on July 9, 2013. (AR 293.) She reported improvement with bending down to pick up clothing from the floor and participating in sports and games. (AR 293.) Plaintiff also indicated improvement in dealing with feelings of anxiety, nervousness, and depression, but that she was still unable to get a good night's sleep. (AR 293.)

On October 23, 2013, Plaintiff called Dr. Adams' office to inform him that she was "not feeling any better," is "more exhausted," and has had "a cold, bronchitis, and sinus infection" for a month. (AR 369.) She also reported she has an upcoming appointment for "bioidentical hormone replacement." (AR 369.)

### 2. Treating Physician Michael J. Powell

Upon relocation of Dr. Adams (AR 54–55), Plaintiff established care at the rheumatology practice of Michael F. McClanahan, PA-C, and Michael J. Powell, M.D., on October 31, 2013. (AR 241, 461.) Plaintiff presented to rheumatologist Dr. Powell on June 3, 2014, for an evaluation. (AR 461.) She reported that she was seeing a hormone specialist, and complained of

nightmares, insomnia, anxiety, and porphyria. (AR 461.)

On September 8, 2014, Plaintiff complained that her heart pounded during the day and at night, that her "mind spins," and that she "can't calm down." (AR 460.) Plaintiff also noted that she met with a hormone specialist with no improvement. (AR 460.) She requested an antidepressant. (AR 460.) Dr. Powell assessed Plaintiff with depression and recommended a trial of Cymbalta. (AR 460.) Dr. Powell also noted Plaintiff's depression on February 19, 2015. (AR 459.)

Plaintiff presented to Dr. Powell on July 22, 2015, for an appointment. (AR 458.) He noted Plaintiff's diagnoses of fibromyalgia, pain, and cognitive impairment, and that there was no change in Plaintiff's symptoms. (AR 458.) Plaintiff's medications were adjusted. (AR 458.)

On August 6, 2015, Dr. Powell completed a "Questionnaire." (AR 464–65.) He opined that Plaintiff's medical problems precluded her from performing "any full-time work at any exertional level, including the sedentary level." (AR 464.) He noted Plaintiff had muscular pain for greater than twelve months. (AR 464.) Dr. Powell stated that Plaintiff's primary impairment was "[s]evere fatigue with pain" and "decreased cognitive function." (AR 464.) He based his opinion on "[s]ymptoms consistent with Fibromyalgia," specifically that Plaintiff had 13 of 19 "pain points" and was therefore positive for a fibromyalgia diagnosis. (AR 464.) Dr. Powell opined that Plaintiff could sit and stand for one hour and walk for thirty minutes during an eight-hour day, and was required to lie down for two hours during an eight-hour day. (AR 464.) Dr. Powell further opined that Plaintiff was "[u]nable to multi-task due to cognitive dysfunction." (AR 464.) He indicated that these limitations existed as of her "[f]irst visit with diagnosis [on] 10/31/13." (AR 465.)

### 3. Stanford Hospital and Clinics

Plaintiff was referred to Stanford to be evaluated for chronic fatigue syndrome/myalgic encephalomyelitis and presented for an assessment on October 21, 2014. (AR 390–93.) She reported symptoms of anxiety/depression, headaches, fatigue, nausea, "brain fog," lack of focus and concentration, dizziness, exhaustion, and "feelings of being overwhelmed." (AR 390.) Plaintiff's physical and mental status examinations were normal. (AR 392.) Plaintiff stated that

her "hormone issues" are "under better control" since she has been taking supplements and seeing an endocrinologist.  (AR 390.)  The evaluating physician's assistant's impression was that Plaintiff's history and symptoms were "consistent" with chronic fatigue syndrome.  (AR 392.) Plaintiff was referred to endocrinology and a sleep center, and was advised to avoid any "major post-exertional malaise episodes," which can be "triggered by physical or cognitive tasks as well as by physical or emotional stressors."  (AR 393.)

Plaintiff attended a follow up appointment on February 10, 2015.  (AR 393, 407–24.)  She reported feeling same as she did the last visit and her physical and mental status examinations were normal.  (AR 407–08.)  The evaluating physician's assistant recommended that Plaintiff begin taking an antibiotic and referred her to a sleep study.  (AR 410-11.)  On March 2, 2015, Plaintiff again presented to the clinic to establish care for her chronic fatigue syndrome, hypothyroidism, and anxiety/depression.  (AR 425.)  On physical examination, the attending physician noted Plaintiff had an appropriate affect and eye contact and intact thought and speech. (AR 435.)  The physician noted Plaintiff was in an "[u]pbeat mood at the beginning of the encounter, then seemed to become dazed as we went through preventative recommendations and rationale."  (AR 435.)  The physician further noted Plaintiff's statements that she was "not disinterested but her fatigue was increasing with the information and the fact she drove 2 hours to be here."  (AR 435.)  She was recommended to return in three months for a follow-up appointment.  (AR 435.)

On September 25, 2015, Jane Norris, PAC, opined that Plaintiff "meets the clinical criteria for Chronic Fatigue and Immune Dysfunction Syndrome."  (AR 466.)  PA Norris stated that "[u]ntil [Plaintiff's] symptoms have measurably improved, I recommend that she limit her workload, daily activities and stress, as overexertion could lead to a worsening of her condition." (AR 466.)

### 4.    Consultative Examiner Paul Martin, Ph.D.

On October 2, 2013, licensed psychologist Dr. Martin review Dr. Adams' treatment notes and medical source statement and performed a mental status evaluation of Plaintiff at the request of the Department of Social Services.  (AR 363–65.)  Plaintiff was observed to have driven

herself to the appointment and was considered a "reliable historian." (AR 363.) She was adequately groomed and presented in a "friendly and cooperative manner" during the evaluation. (AR 364.) Plaintiff made good eye contact, her facial expression and gross motor function were normal, and she interacted appropriately. (AR 364.) She was able to ambulate without assistance. (AR 364.)

Plaintiff complained of an "18 year history of chronic fatigue syndrome and fibromyalgia" with "accompanying anxiety and depression." (AR 363.) She reported symptoms of "low energy, poor motivation, crying spells, anhedonia, memory problems, and feelings of hopelessness." (AR 363.) Plaintiff also reported feeling suicidal at times and is "often nervous, worried, and tense." (AR 363.) She denied having panic attacks. (AR 363.) She reported that she stopped working in 2013 because "she always feels as though she is in a 'brain fog.'" (AR 364.)

Plaintiff reported physical and cognitive limitations, but was "independent for basic [activities of daily living]." (AR 364.) Specifically, she is able to prepare simple meals, light household chores, make change at the store, take public transportation independently, and drive a car. (AR 364.) She reported she typically spends her day at home resting, and her level of activity varies depending on how she feels. (AR 364.) Plaintiff lives alone. (AR 364.)

Plaintiff's mental status examination was normal except that she was noted to be tearful at times. (AR 364.) Dr. Martin diagnosed Plaintiff with major depressive disorder, recurrent (moderate), and pain disorder associated with both psychological factors and a general medical condition. (AR 365.) He assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 60 and a prognosis of "guarded." (AR 365.) With respect to Plaintiff's mental residual functional capacity ("RFC")[3], Dr. Martin opined that Plaintiff's ability to understand, remember,

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

and carry out simple instructions and to manage funds independently was unimpaired. (AR 365.) He opined Plaintiff had mild impairment in the following areas: the ability to understand, remember, and carry out detailed and complex instructions; the ability to maintain attention and concentration throughout the current evaluation; the ability to maintain pace throughout the current evaluation; the ability to endure the stress of the current interview; and the ability to interact with the public, supervisors, and coworkers in a work setting. (AR 365.) Plaintiff's ability to maintain pace and persistence throughout the evaluation and her ability to adapt to changes in routine work-related settings were deemed by Dr. Martin to be moderately impaired. (AR 365.)

### 5. State Agency Physicians

On September 16, 2013, Martha A. Goodrich, M.D., a state agency physician, reviewed the record and assessed Plaintiff's physical RFC. (AR 79–80, 82–83.) Dr. Goodrich found that Plaintiff could: occasionally lift and/or carry 20 pounds and frequently 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for more than six hours in an eight-hour workday; perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions; occasionally climb, kneel, crouch, and crawl; and frequently balance and stoop. (AR 82–83.) Dr. Goodrich found that Plaintiff had no other limitations. (AR 83.) Upon reconsideration on March 7, 2014, another state agency physician, A. Nasrabadi, M.D., reviewed the record and affirmed Dr. Goodrich's findings. (AR 96–98.)

State agency physician H. Amado, M.D., reviewed the record and assessed Plaintiff's mental RFC on October 18, 2013. (AR 79–80, 83–85.) Dr. Amado opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace, and had the severe impairments of affective disorder and somatoform disorder. (AR 80.) Dr. Amado opined further that Plaintiff could maintain concentration, persistence, and pace for only simple tasks. (AR 84.) Upon reconsideration on March 3, 2014, another state agency physician, G. Ikawa, M.D., reviewed the record and affirmed Dr. Amado's findings. (AR 94–95, 98–99.)

### B. Administrative Proceedings

The Commissioner denied Plaintiff's application for benefits initially on October 18,

2013, and again on reconsideration on March 7, 2014. (AR 103–07, 111–16.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 118–19, 122–25.) At the hearing on August 17, 2015, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 44–65.)

## 1. Plaintiff's Testimony

Plaintiff testified that her primary physical problem is fibromyalgia. (AR 46–47.) According to Plaintiff, her fibromyalgia causes her headaches and pain across the top of her shoulders, up the sides of her neck, and in her hands periodically. (AR 57, 61–62.) Exhaustion is the "main symptom" of Plaintiff's fibromyalgia: "[e]verything is exhausting." (AR 58–59.) Her exhaustion is worse after a long day and she does not wake refreshed in the morning. (AR 59.) Plaintiff testified that she has to lie down two to four hours a day. (AR 60.) A couple days a week she cannot go out to do her "normal things" or things she had planned. (AR 61.)

Plaintiff testified she also has "major anxiety and depression." (AR 48.) She testified that if she sits too long she gets anxious and "can't concentrate or focus or remember anything." (AR 57, 58.) She testified that "[e]verything overwhelms me, and I'm exhausted over anything I have to figure out, anything I have to plan. Just life is overwhelming." (AR 60.) She has trouble keeping pace doing tasks. (AR 62–63.) Plaintiff testified it takes her "a lot longer" to perform tasks because she gets distracted and anxious easily, and when she starts a task she needs to distract herself because it "overwhelms" her. (AR 63.) According to Plaintiff, at her prior job as an x-ray technician she was reported to her supervisor on approximately five occasions because she could not "keep up." (AR 60, 64.) She testified that that was part of the reason she left that position, specifically that it was "very stressful with everybody watching you and looking for mistakes and telling you you couldn't remember things." (AR 64.)

Plaintiff testified that she takes medications and "natural supplements" to help with her fibromyalgia, and that her rheumatologists prescribed her Zoloft for her anxiety and depression. (AR 48.) She had seen mental health professionals on her own until a year prior to the hearing when her insurance ran out. (AR 48.)

Plaintiff rents a room out of her house to a tenant she found on craigslist; otherwise she

lives alone. (AR 49–50.) She testified she performs light housework (e.g., microwaving, laundry, cleaning) with no assistance. (AR 50.) Plaintiff is able to drive herself to the grocery store, to visit her parents (who live five minutes away) two to three times a week, and to a church for Bible study. (AR 51, 53.) She estimated spending two and half to three hours a week on church activities. (AR 51–52.) Plaintiff testified she watches television for about an hour every day, checks Facebook, does her banking online, walks her dog, and goes out to eat with friends. (AR 53–54.) Her mother drove her to Reno for medical treatment on three or four occasions, and she was driven to appointments at Stanford Hospitals and Clinics on five occasions. (AR 54–56.) She also traveled via car to Lake Tahoe for a vacation for five days. (AR 55.) Plaintiff testified that she suffers from anxiety when sitting in the car for too long, and that she takes "[f]requent stops and lots of deep breathing and self-talk" to calm down. (AR 56.)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") indicated that Plaintiff had the following past work: as a receptionist, Dictionary of Operational Titles (DOT) code 237-367.038, which was sedentary exertional work, with a specific vocational preparation (SVP)[4] of 4; and as an x-ray operator, DOT code 199.361-010, light, SVP of 5. (AR 65–67, 266.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work background. (AR 67.) The VE was also to assume this person had the following limitations: lifting and carrying less than 10 pounds occasionally; sitting for six hours but standing and/or walking for less than two hours in an eight-hour workday; never climb, balance, stoop, kneel, crouch, or crawl; would need numerous unscheduled rest breaks; and would not have sufficient concentration ability for even simple, routine tasks. (AR 67.) The VE testified that there was no work such a person could perform. (AR 67.) The ALJ asked a follow up question regarding a second hypothetical worker who had the following limitations: lifting and carrying 20 pounds occasionally and 10 pounds frequently;

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

sitting, standing and/or walking for six to eight hours out of an eight-hour workday, with normal breaks; climb, kneel, or crouch occasionally; and frequently balance or stoop. (AR 68.) The VE testified that such a person could perform Plaintiff's past relevant work, and that that Plaintiff could also perform other light, unskilled work in the national economy such as an office helper, DOT code 239.569-010, SVP 2. (AR 69–70.)

Finally, Plaintiff's attorney inquired of the VE whether the individual in the second hypothetical who would be also be off task 15% of the workday with respect to maintaining persistence and pace could perform Plaintiff's past work or any work in the national economy. (AR 70–71.) The VE testified that that there would be no work that such individual could perform. (AR 71.)

## C.    The ALJ's Decision

In a decision dated October 21, 2015, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 20–32.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 22–31.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since March 18, 2013, the alleged onset date (Step One). (AR 22.) At Step Two, the ALJ found Plaintiff's following impairments to be severe: chronic fatigue disorder and fibromyalgia. (AR 22.) The ALJ further found, however, only mild limitations in Plaintiff's activities of daily living, social functioning and concentration, persistence, and pace, and no episodes of decompensation that have been of extended duration. (AR 24–25.) The ALJ, therefore, found that "[b]ecause [Plaintiff's] medically determinable mental impairments [of affective and anxiety disorders] cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere." (AR 25) (citing 20 C.F.R. § 404.1520a(d)(1).) Moreover, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (Step Three). (AR 25.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at Steps Four and Five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your

residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff retained the RFC:

> to perform light work as defined in 20 CFR [§] 404.1567(b) except she can occasionally climb, kneel, and crouch, and frequently balance and stoop.

(AR 25.)   Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely credible."  (AR 28.)  The ALJ found that, on the basis of the RFC assessment, Plaintiff retained the capacity to perform her past work as a receptionist and an x-ray operator.  (Step Four).  (AR 30–31.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on March 9, 2017.  (AR 1–7, 15–16.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

## II.        LEGAL STANDARD

### A.        Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if

considered separately, would be of such severity." *Id.* § 423(d)(2)(B). For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 404.1520(a)(4) (providing the "five-step sequential evaluation process"). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.  Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial

13

evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## III.    DISCUSSION

Plaintiff contends that the ALJ erred in three respects: (1) the ALJ erred in finding at Step Two that Plaintiff's mental impairments associated with her fibromyalgia and chronic fatigue syndrome were not severe; (2) the ALJ's RFC assessment, particularly the finding that Plaintiff

retained the ability to perform light work, is not supported by substantial evidence; (3) the ALJ failed to articulate specific, clear and convincing reasons for discounting Plaintiff's testimony regarding her subjective complaints. (*See* Doc. 16 at 8–25; Doc. 20 at 4–9.) Defendant counters that Plaintiff has not met her burden of establishing the existence of a severe mental impairment at Step Two, that the ALJ properly weighed the medical evidence and assessed Plaintiff's RFC, and that the ALJ's credibility assessment of Plaintiff was appropriate. (Doc. 19 at 12–17.)

## A.     The ALJ Committed Harmful Error at Step Two by Failing to Determine Plaintiff's Mental Impairments Were Severe.

### 1.     Legal Standard

"At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments." *Smolen v. Chater*, 80 F.3d 1273, 1289–90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987)). "[A]t the step two inquiry, . . . the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe." *Id.* at 1290 (citing 42 U.S.C. § 423(d)(2)(B) and TITLES II & XVI: THE SEQUENTIAL EVALUATION PROCESS, Social Security Ruling ("SSR") 86-8 (S.S.A. 1986)).

"[A]n impairment is not severe if it does not significantly limit [the claimant's] . . . ability to do basic work activities." *Id.* at 1290 (citing 20 C.F.R. §§ 404.1520(c) & 404.1521(a)). "[B]asic work activities are the abilities and aptitudes necessary to do most jobs." TITLES II & XVI: MED. IMPAIRMENTS THAT ARE NOT SEVERE, SSR 85-28 (S.S.A. 1985). Examples of "basic work activities" include (1) "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," (2) "[c]apacities for seeing, hearing, and speaking," (3) "[u]nderstanding, carrying out, and remembering simple instructions," (4) "[u]se of judgment," (5) "[r]esponding appropriately to supervision, co-workers and usual work situations," and (6) "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922(b).

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an [individual's] ability to work.'" *Smolen*, 80 F.3d at 1290 (quoting SSR 85–28). Additionally,

"an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85–28); *cf. Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005) (finding that the claimant "failed to meet his burden of establishing disability" where "none of the medical opinions included a finding of impairment, a diagnosis, or objective test results").

"Great care should be exercised in applying the not severe impairment concept." SSR 85–28. "The Commissioner has stated that '[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step.'" *Webb*, 433 F.3d at 687 (alteration in original) (quoting SSR 85–28).

Ultimately, "[t]he severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Yuckert*, 482 U.S. at 153. In other words, "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (*citing Yuckert*, 482 U.S. at 153–54). Nonetheless, "[t]he plaintiff has the burden of establishing the severity of the impairment." *Cookson v. Comm'r of Soc. Sec.*, No. 2:12–cv–2542–CMK, 2014 WL 4795176, at *2 (E.D. Cal. Sept. 25, 2014); *see, e.g.*, *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("The claimant carries the initial burden of proving a disability in steps one through four of the analysis.") (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).

## 2. Analysis

Here, Plaintiff contends that the ALJ erred in determining that the medical evidence "clearly established" she had no more than a "slight abnormality" with respect to the mental impairments of affective and anxiety disorders, which Plaintiff contends are associated with her fibromyalgia and chronic fatigue syndrome, because the ALJ improperly rejected the uncontradicted opinions of evaluating psychologist Dr. Martin and state agency physicians Drs.

Amado and Ikawa.[5]  (*See* Doc. 16 at 10–13.)  The Court agrees.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  *Holohan v. Massanari,* 246 F.3d 1195, 1201–02 (9th Cir. 2001); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  Generally speaking, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a non-examining physician's opinion. *Holohan*, 246 F.3d at 1202.  To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830–31.  An ALJ may reject the opinion of a non-examining physician "by reference to specific evidence in the medical record."  *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir.1998) (citations omitted); *see Haislip v. Colvin,* No. 1:12–cv–00964 GSA, 2013 WL 5476428, at *10 (E.D. Cal. Sept. 30, 2013) (ALJ must provide specific and legitimate reasons supported by substantial evidence in the record for rejecting non-examining physician's opinions).

Following a review of treating rheumatologist Dr. Adams' records and an examination of

---

[5] Plaintiff clarifies in her Opening Brief that she "does not contend her mental impairment by itself is disabling" but instead is a manifestation of her fibromyalgia and chronic fatigue syndrome (*see* Doc. 16 at 15), the diagnoses of which are not disputed (*see* Doc. 19 at 13).  While the Ninth Circuit "has recognized fibromyalgia as a physical rather than a mental disease," *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 873 (9th Cir. 2004), Social Security Ruling 12-2p advises that symptoms of fibromyalgia can contribute to, or factor into, mental limitations.  *See* TITLES II & XVI: EVALUATION OF FIBROMYALGIA, SSR 12-2P (S.S.A. July 25, 2012) ("Based on these criteria, we may find that a person has an [medically determinable impairment] of [fibromyalgia] if he or she has all three of the following criteria . . . 2. Repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, *cognitive or memory problems ("fibro fog")*, waking unrefreshed, *depression, anxiety disorder*, or irritable bowel syndrome . . . .) (emphasis added).  The Ruling continues: "People with [fibromyalgia] may also have nonexertional physical or *mental limitations* because of their pain or other symptoms."  *See id*.  (emphasis added).  According to Social Security Ruling 14-1p, chronic fatigue syndrome causes "prolonged fatigue lasting 6 months or more, resulting in a substantial reduction in previous levels of occupational, educational, social, or personal activities."  TITLES II & XVI: EVALUATING CLAIMS INVOLVING CHRONIC FATIGUE SYNDROME (CFS), SSR 14-1P (S.S.A. Apr. 3, 2014).

The Commissioner does not appear to contend, either at the administrative level or at this stage of the proceedings, that severe fibromyalgia and/or chronic fatigue syndrome could *never* give rise to mental limitations, only that the ALJ's conclusion at Step Two that Plaintiff's mental limitations associated with her severe fibromyalgia and chronic fatigue syndrome were not severe was clearly established by the medical evidence in *this* case.

17

Plaintiff, Dr. Martin assessed a GAF score of 60[6] and diagnosed Plaintiff with major depressive disorder, recurrent (moderate), and pain disorder associated with both psychological factors and a general medical condition. (AR 365.) He opined, in pertinent part, that Plaintiff's ability to maintain pace and persistence throughout the evaluation and her ability to adapt to changes in routine work-related settings were "moderately impaired." (AR 365.) State agency physicians Drs. Amado and Ikawa similarly opined that Plaintiff had "moderate difficulties" in maintaining concentration, persistence, and pace, and had the severe impairments of affective disorder and somatoform disorder. (AR 80, 94–95.) They further opined that Plaintiff could maintain concentration, persistence, and pace for only simple tasks. (AR 84, 98–99.)

The ALJ provided two reasons for assigning "minimal weight" and "no weight" at Step Two to the opinions of Dr. Martin and Drs. Amado and Ikawa, respectively. Neither was clear and convincing (sufficient to reject in part the opinion of examining psychologist Dr. Martin) or based on specific evidence in the record (sufficient to reject the opinions of state disability non-examining physicians Drs. Amado and Ikawa).

### a.    Lack of Treatment

First, the ALJ noted that the opinions are inconsistent with Plaintiff's failure to seek mental health treatment. (AR 23–24.) Specifically, although Plaintiff "takes depression and anxiety medication," she "testified, and the record confirms, that she has never sought or received psychiatric care." (AR 22–23.) According to the Ninth Circuit, "the fact that [a] claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [a physician's] assessment of [a] claimant's condition is inaccurate." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996); *see also Ferrando v. Comm'r of Soc. Sec. Admin*., 449 Fed. App'x 610, 611–12 (9th Cir. 2011) ("[F]ailure to seek treatment for his mental illness . . . is not a clear and convincing reason to reject his [treating] psychiatrist's opinion, especially where that failure to seek treatment is explained, at

---

[6] The ALJ noted in its decision that "[a] GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks,) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). (AR 23) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (DSM-IV-TR, 34(2000)).)

least in part, by [the claimant's] degenerating condition.") (citing *Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) (noting that the Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation'" (quoting *Nguyen*, 100 F.3d at 1465)).

Moreover, the medical record and the hearing testimony both demonstrate, contrary to the ALJ's finding, that Plaintiff <u>did</u> pursue mental health treatment—when she could afford it. A claim communications note from J. McSwain dated September 16, 2013, indicated he/she spoke with Plaintiff regarding additional medical sources. (AR 77–78.) J. McSwain wrote, "[Plaintiff] . . . stated she talks [with a psychologist] for an over the phone session." (AR 78.)[7] Plaintiff also testified at the hearing that she had seen mental health professionals on her own up until a year before the hearing, at which point her insurance ran out. (AR 48.) The inability to afford treatment is not an appropriate reason to reject a medical opinion. *See Regennitter*, 166 F.3d at 1297 (holding that the failure to seek treatment was not a legitimate basis for rejecting a disability claim, if a claimant could not afford treatment); *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995) ("'It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'") (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)). Here, the ALJ's decision provided no basis to reject Plaintiff's explanation that she stopped seeking further treatment due to her lack of insurance—indeed, the decision did not address it.

Plaintiff's failure to seek further treatment from mental health professionals, particularly where the evidence shows her failure was due to a lack of insurance, was therefore not a clear and convincing (or even a legitimate) reason to discount in part the opinion of examining physician Dr. Martin regarding Plaintiff's mental limitations. *See, e.g., Godoy v. Berryhill*, Case No. ED CV 17–608 MRW, 2018 WL 1169265, at *4 (C.D. Cal. Mar. 1, 2018); *Wilkerson v. Berryhill*,

---

[7] J. McSwain further noted that, according to Plaintiff, the psychologist could not provide any medical evidence to the agency since the psychologist "only talks [with Plaintiff] over the phone." (AR 78.)

Case No. 16-cv-02757-LB, 2017 WL 4340365, at *15 (N.D. Cal. Sept. 29, 2017); *Yeakey v. Colvin*, No. CV13–05598–BJR, 2014 WL 3767410, at *4 (W.D. Wash. July 31, 2014). The ALJ's rejection of the opinions of non-examining physicians Drs. Amado and Ikawa regarding the severity of Plaintiff's mental impairments was similarly flawed because it was based on a mischaracterization of the record and hearing testimony and therefore lacked the factual support of "specific evidence" in the record. *See, e.g., Silvas v. Astrue*, No. 09–cv–00030–JLT, 2010 WL 1241301, at *14 (E.D. Cal. Mar. 26, 2010). Indeed, the Commissioner concedes these points. (*See* Doc. 19 at 16 n.5 ("The Commissioner concedes that failure to pursue mental health treatment was not a legitimate reason to reject Dr. Martin's opinion, or the opinions of the State agency psychological medical consultants . . . .").)

### b. Activities of Daily Living

The ALJ also rejected at Step Two the opinions of Drs. Martin, Amado, and Ikawa as inconsistent with Plaintiff's activities of daily living. (AR 23–24.) The ALJ did not identify at Step Two, however, what specific activities were inconsistent with the opinions. (AR 23–24.) While the ALJ noted Dr. Martin's report that Plaintiff "was independent with her activities of daily living as she lived alone and was able to prepare simple meals, perform household chores, make change at the store, take public transportation independently, and drive a car," the ALJ did not specify how those cited activities rendered Dr. Martin's opinion internally inconsistent, nor did he identify any other evidence of Plaintiff's daily activities—not reported to Dr. Martin—that is inconsistent with Dr. Martin's (or Drs. Amado's and Ikawa's) opinions. The ALJ's failure to identify specific conflicting activities of daily living, or otherwise explain the nature of the alleged conflict, was error. *See Popa v. Berryhill,* 872 F.3d 901, 906 (9th Cir. 2017) (finding the ALJ erred when he failed to explain why the claimant's daily activities were inconsistent with the doctor's opinion); *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

The ALJ did note certain of Plaintiff's daily activities in his consideration of the "four broad functional areas" (also known as the "Paragraph B" criteria), but the evidence shows Plaintiff's performance of those activities was more qualified than the ALJ's description would

suggest.[8]  For example, although the ALJ stated Plaintiff "has engaged in a relative normal level of daily activity" (*see* AR 24), Plaintiff reported to Dr. Martin that she typically spends her day at home resting and her level of activity varies depending on how she feels.  (AR 364.)  Plaintiff also testified that she has to lie down two to four hours a day and that at least couple days a week she is too exhausted to go out to do her "normal things" or things she had planned.  (AR 61.)  The ALJ noted Plaintiff testified that she "has taken several long road trips for vacations and medical treatment" (*see* AR 24), but omitted her testimony that she was driven to those medical appointments by someone else and that that she suffers from anxiety when sitting in the car for too long, causing her to take "[f]requent stops and lots of deep breathing and self-talk" to calm down.  (AR 56.)  Further, though the ALJ indicated "the majority of the mental status examinations in the record indicate that [Plaintiff's] mood and affect were appropriate or normal" and that those mental status examinations have been "unremarkable" (*see* AR 22–23, 25), the record reflects Plaintiff presented to the consultative examiner as "tearful at times" (*see* AR 364) and Plaintiff's treatment provider noted that she "seemed to become dazed as we went through preventative recommendations and rationale."  (AR 435.)  Finally, a claimant need not be "utterly incapacitated" to be eligible for disability benefits, *Smolen*, 80 F.3d at 1284, or "be penalized for attempting to lead normal lives in the face of their limitations."  *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998).  As the ALJ has not explained how Plaintiff's activities of daily living contradict the opinions of Drs. Martin, Amado, and Ikawa, and as Plaintiff should not be penalized for attempting to live a normal life, the ALJ erred in rejecting those opinion on this basis.

In sum, neither of the two reasons offered by the ALJ to reject in part Dr. Martin's opinion is clear and convincing, nor are they based on specific evidence in the record such would support the rejection of the opinions Drs. Amado and Ikawa.  The ALJ therefore "lacked substantial evidence to find that the medical evidence clearly established [Plaintiff's] lack of" the

---

[8] The ALJ also mischaracterized the record during his Paragraph B assessment.  In finding that Plaintiff had only mild limitation in concentration, persistence, or pace, the ALJ stated that "the consultative examiner indicated that [Plaintiff] only has mild limitations in this area of mental functioning."  (AR 25.)  To the contrary, Dr. Martin opined that Plaintiff's ability to maintain pace and persistence throughout the evaluation was <u>moderately</u> impaired.  (AR 365.)

medically severe mental impairments of affective and anxiety disorders. *Webb*, 433 F.3d at 688. Accordingly, the ALJ's Step Two finding cannot stand.

### c. Harmless Error Analysis

Because Plaintiff was found to have at least one severe impairment (*see* AR 22), this case was not resolved at Step Two. Plaintiff does not assign error to the ALJ's finding at Step Three. Thus, as noted by the Commissioner (Doc. 19 at 14), any error in the ALJ's finding at Step Two is harmless, if all impairments, severe and non-severe, were considered in the determination Plaintiff's RFC. *See Lewis v. Astrue*, 498 F.3d 909, 910 (9th Cir. 2007) (holding that a failure to consider an impairment in step two is harmless error where the ALJ includes the limitations of that impairment in the determination of the residual functional capacity). The record demonstrates this was not done. (*See* AR 27–28.) In determining Plaintiff's RFC, the ALJ did not include or discuss any functional limitations related to Plaintiff's mental impairments associated with her fibromyalgia and chronic fatigue syndrome in determining Plaintiff's RFC, including those assessed by Drs. Martin, Amado, and Ikawa.[9] (*See* AR 25–30.) For example, Dr. Martin determined Plaintiff's ability to adapt to changes in routine work-related settings are moderately impaired. (AR 365.) However, the RFC does not include any limitations related to Plaintiff's ability to adapt to changes in the workplace. (*See* AR 25.) Similarly, although Drs. Amado and Ikawa opined Plaintiff would have moderate difficulties in maintaining concentration, persistence, and pace, and could maintain concentration, persistence, and pace for only simple tasks, the ALJ did not include these functional limitations in the RFC. (*Compare* AR 80, 84, 94–95, 98–99 *with* AR 25.) As the ALJ failed to discuss the significant, probative evidence favorable to Plaintiff contained in the medical opinions, the RFC was incomplete and the ALJ's error was not harmless. *See, e.g., Inskeep v. Colvin*, No. 3:15-cv-00759-BR, 2016 WL 3509395, at *4 (D. Or. June 27, 2016) (concluding that the ALJ erred at Step Two when he found Plaintiff's mental impairments are nonsevere and finding that error is not harmless because the ALJ did not include any mental limitations in his assessment of Plaintiff's RFC.) Remand is

---

[9] The ALJ mistakenly stated "Dr. Ikawa" reviewed the physical portion of the claim on reconsideration. (*See* AR 30.) In fact, Dr. Nasrabadi, M.D. assessed Plaintiff's physical RFC on reconsideration (*see* AR 96–98), and it was this opinion that was given "great weight" by the ALJ (AR 30.)

therefore warranted.

**B.      Remand for Further Proceedings is Appropriate.**

The Court has the discretion to remand the case for additional evidence and findings or to award benefits. *Smolen*, 80 F.3d at 1292. The Court may award benefits if the record is fully developed and further administrative proceedings would serve no useful purpose. *Id.* Remand is appropriate when additional administrative proceedings could remedy defects. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989). In this case, the Court finds that further proceedings are necessary to formulate an assessment of Plaintiff's RFC that takes into account Plaintiff's mental limitations and to determine whether Plaintiff is disabled. Accordingly, the Court remands this matter to the Commissioner for further administrative proceedings. *See, e.g., Simmons v. Colvin*, No. CV 12–06060–AJW, 2013 WL 3337666, at *3-4 (C.D. Cal. July 1, 2013) (finding error at step two and remanding for further administrative proceedings).

In light of the remand required by the ALJ's error at Step Two, the Court finds it unnecessary to address Plaintiff's arguments with respect to the ALJ's rejection of Plaintiff's treating rheumatologists' opinions regarding her fibromyalgia and chronic fatigue syndrome and their limitations on her RFC, and the ALJ's failure to credit the testimony of Plaintiff, as both concern evidence of Plaintiff's alleged mental impairments that will be reconsidered on remand.[10] *See, e.g., Cable v. Astrue*, No. CIV S 06-0515 DAD, 2007 WL 2827798, at *6–7 (E.D. Cal. Sept. 27, 2007); *Sanchez v. Apfel*, 85 F. Supp. 2d 986, 993 n.10 (C.D. Cal. 2000) (having concluded that remand is appropriate because the ALJ erred at step two, the court need not consider issues

---

[10]   *See, e.g.*, AR 292 (Plaintiff assessed by Dr. Adams with "[l]ongstanding history of chronic fatigue syndrome/fibromyalgia syndrome with persistent disability based on chronic fatigue, *lack of mental focus*, chronic nausea and *inability to focus*.") (emphasis added); AR 459–460 (Plaintiff assessed by Dr. Powell with depression and provided Cymbalta, ); AR 464 (finding by Dr. Powell that Plaintiff's primary impairment was "[s]evere fatigue with pain" and "*decreased cognitive function*," and opining that Plaintiff was "[u]nable to multi-task due to cognitive dysfunction.") (emphasis added); AR 364 (Plaintiff reporting to Dr. Martin that she has cognitive limitations and stopped working due to "brain fog"); AR 48 (Plaintiff's testimony that has "major anxiety and depression."); AR 57–58  (Plaintiff's testimony that if she sits too long she gets anxious and "can't concentrate or focus or remember anything."); AR 59 (Plaintiff's testimony she does not wake refreshed in the morning);  AR 62–63 (Plaintiff's testimony that she has trouble keeping pace doing tasks, gets distracted and anxious easily, and when she starts a task she needs to distract herself because it "overwhelms" her.); AR 60, 64 (Plaintiff's testimony that she was reported to her supervisor at her prior job as an x-ray technician because she could not "keep up."); AR 64 (Plaintiff's testimony that part of the reason she left her prior job as an x-ray technician was because it  was "very stressful with everybody watching you and looking for mistakes and telling you you couldn't remember things.").

of credibility).  On remand, an ALJ will necessarily be required to re-determine Plaintiff's RFC in light of all her impairments—both physical and mental—and the entire record[11], and to re-consider whether Plaintiff is capable of performing her past relevant work or any other work in the national economy.  Proper weight must be given to the opinions of treating and examining physicians.  *See Lester*, 81 F.3d at 830; *Smolen*, 80 F.3d at 1285.  The testimony of Plaintiff must be reevaluated, and if Plaintiff's testimony about the severity of her symptoms is rejected, specific, clear and convincing reasons must be given for doing so.  *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *see also Reddick*, 157 F.3d at 722.

## IV.        CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Lori Lynn Kendall and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **May 8, 2018**                        /s/ *Sheila K. Oberto*
                                        UNITED STATES MAGISTRATE JUDGE

---

[11] As Plaintiff correctly points out, this includes the September 25, 2015, letter from Jane Norris, PAC, of Stanford Hospitals and Clinics (AR 466), which was presented to and considered by the Appeals Council in its review of the ALJ's decision (*see* AR 2).  *See Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159–60 (9th Cir. 2012) ("[W]hen a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record . . . .")